GORSUCH, J.,
concurring in the judgment, joined by BRISCOE, Chief Judge, and O’BRIEN, Circuit Judge.
I reach the same destination as the majority but by a different path. Most of this case is moot — and has been for years. What little of this lawsuit that remains fails to implicate our jurisdiction because even a favorable decision won’t redress the Wilderness Society’s claimed injury. For these reasons, and like the court, I would vacate the district court’s decision with instructions to dismiss this case.

Mootness

The Wilderness Society’s central challenge in this lawsuit is to a short-lived, long-defunct ordinance. Enacted in August 2005, that ordinance authorized Kane County officials to open certain roads to off-highway vehicles (OHVs), and to place decals on county road numbering signs alerting drivers of this policy. After the Society filed suit, asserting that the Bureau of Land Management’s (BLM) management plan preempted the County’s ordinance by forbidding OHVs from using the roads in question, the County quickly *1175 rescinded its ordinance in 2006 and removed all of its OHV-authorizing decals. Without the ordinance and decals in place, OHV traffic isn’t permitted on the roads in question — and hasn’t been for four years. See Utah Code Ann. § 41-22-10.3 (“A person may not operate an off-highway vehicle upon any street or highway, not designated as open to off-highway vehicle use.... ”). There are no OHVs left to fight over; the Society won exactly the relief it sought merely by filing its lawsuit; still, this litigation has lumbered on, with the parties and the lawyers fighting about OHV traffic that is and has long been forbidden. This isn’t so much a live lawsuit as it is the ghost of a lawsuit past.
We don’t usually prolong litigation in this way, allowing the fight to continue after one side has thrown in the towel. Especially when carrying on the fight requires us to decide novel and hotly disputed questions of law. Instead, when we face situations like this, we usually say that the controversy has become “so attenuated that considerations of prudence and comity ... counsel the court to stay its hand,” at least as a matter of judicial restraint if not constitutional imperative. Southern Utah Wilderness Alliance v. Smith, 110 F.3d 724, 727 (10th Cir.1997) (internal quotation omitted). This practice “pertains throughout the life of a case. So even if a lawsuit involved a live dispute” at one stage, if at any point the dispute dissipates “we will say that the suit has become moot.” Wyoming v. U.S. Dep’t of Interior, 587 F.3d 1245, 1250 (10th Cir.2009). This rule “holds true even if all the parties before us still wish us to render an opinion to satisfy their demand for vindication or curiosity about who’s in the right and who’s in the wrong. Our job is to decide cases that matter in the real world, not those that don’t.” Id. For one, I would follow this cautionary rule of restraint and dismiss the bulk of this suit.
Of course, a defendant’s “voluntary cessation of a challenged practice” is not always enough to render a case moot. See City of Mesquite v. Aladdin’s Castle, Inc., 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982). This court has, however, “preclud[ed] a mootness determination in cases challenging a prior version of a state statute only when the legislature has openly expressed its intent to reenact the challenged law.” Camfield v. City of Oklahoma City, 248 F.3d 1214, 1223 (10th Cir.2001) (emphasis added). And in this case, the County hasn’t expressed any such intent. Just the opposite. In deposition testimony and a press release accompanying the ordinance’s repeal in 2006, Kane County commissioners repeatedly stated that they wished first to resolve the existence and scope of the County’s R.S. 2477 rights — including whether those rights allow it to sanction OHV use in the face of a contrary federal management plan — through a quiet title action before considering any modified ordinance allowing OHV use. See, e.g., Aplt.App. at 839 (public notice explaining the County’s intent to put off the question whether and under what circumstances to allow OHV traffic until “after, first, securing federal recognition of Kane County’s ownership of R.S. 2477 rights-of-ways ... and [after] other related legal issues are more fully resolved”); id. at 1212-1218, 1228. And over the last four years, the County has followed exactly the course it promised, pursuing a separate and still ongoing quiet title action to ascertain the scope of its R.S. 2477 rights. See Kane County v. United States, No. 2:08-CV0315 CW (D.Utah).
At the very most, the evidence before us suggests only that the County might enact a different ordinance in the future after resolving the legal uncertainties surrounding the scope of its R.S. 2477 rights — all in *1176 a careful attempt to avoid disputes like this one. And there can be little doubt that such a different ordinance, if it is ever enacted and then challenged, will present different legal and factual questions for decision. For example, a new ordinance might close roads to OHV use that the old ordinance sought to open, or seek to open roads the old ordinance closed to OHVs. The operative federal management plan might be different than the one now in place, as a result of ongoing negotiations between federal agencies and the County. And by the time any new ordinance is enacted, we may know the results of the County’s quiet title action and so have a firmer grip on the scope of its R.S. 2477 rights of way. So it is that the outcome of any new dispute between the parties will surely turn on new legal and factual circumstances.
Just as certain, the courts can and will address those questions if and when they arise. But the fact that we may lawfully decide the fate of a new and different ordinance raising new and different legal and factual questions in a different lawsuit at some later date doesn’t mean we should keep on life support a lawsuit about a defunct ordinance the County itself left for dead years ago. See, e.g., Unified Sch. Dist. No. 259 v. Disability Rights Ctr. of Kan., 491 F.3d 1143, 1150 (10th Cir.2007) (holding that mootness applies because future instances of wrongful conduct “may be quite different” than that alleged); Md. Highways Contractors Ass’n., Inc. v. Maryland, 933 F.2d 1246, 1249-50 (4th Cir. 1991) (“The statute challenged by the Association no longer exists; a new statute replaced it. In order to determine if someone has been injured by the new statute, we would need more information about the new statute than is presently before us.”); 13C Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac. & Proc. § 3533.6, at 318-19 (3d ed. 2008) (“If the questions that seem to remain open after the revision are quite different from the questions that were initially disputed, it may seem better simply to terminate the present proceeding, so that the new questions can be addressed in other litigation specifically framed for that purpose.”).[1]

*1177
Redressability

While the Society’s complaint is primarily directed at the County’s defunct ordinance and discarded decals that used to authorize OHV traffic, one smaller aspect of its complaint remains. The Society also challenges the County’s practice of erecting county road numbering signs (e.g., “Kane County, K3935”) on its claimed R.S. 2477 rights of way inside BLM lands. These signs are aimed only at identifying the road for routine public traffic; they do not authorize or permit OHV usage on the roads in question. See Utah Code Ann. § 41-22-10.3; supra n. 1. Even so, we should declare the County road numbering signs impermissible under the Supremacy Clause, the Society says, because BLM regulations preempt them.
Neither does this part of the Society’s claim appear moot. While the County quickly rescinded its OHV ordinance and removed its OHV authorizing decals after the Society filed suit, and thus disallowed OHV traffic, the County has continued to assert its right simply to post county road numbering signs on its claimed R.S. 2477 rights of way for the convenience of other travelers, and the County did continue to litigate this issue before the district court. So the question remains whether the County can post road numbering signs, even if it no longer purports to permit OHVs.
But while this portion of the lawsuit isn’t moot, the Society faces another problem. To claim standing to sue under Article III, a plaintiff must satisfy three “irreducible constitutional” elements — it must have suffered an “injury in fact”; the complained-of conduct must have caused the injury; and there must be a “likelihood that the requested relief will redress the alleged injury.” Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); Steel Co. v. Citizens for a Better Env., 523 U.S. 83, 103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Even assuming without deciding the Society can meet the first two of these elements, it cannot satisfy the third.
By way of relief, the Society asks us to invoke the Supremacy Clause and enjoin County laws or actions inconsistent with federal law. See Const. Art. VI, cl. 2.[2] In *1178 this case, however, if any conflict exists it is only between competing claims arising under federal law. On the one hand, the Society argues that certain federal BLM regulations, issued pursuant to the Federal Land Policy and Management Act, dosed the roads in question to any traffic. See Federal Land Policy and Management Act of 1976 (“FLPMA”), Pub.L. No. 94-579, § 701(h), 90 Stat. 2744, 2786; see also 43 U.S.C. § 1782(c). On the other hand, it was undisputed that the County asserts its entitlement to post road numbering signs on the lands in question only by virtue of another federal statute, R.S. 2477. See Act of July 26, 1866 (“R.S. 2477”), ch. 262, § 8,14 Stat. 251, 253, codified at 43 U.S.C. § 932, repealed by FLPMA § 706(a), 90 Stat. at 2786 (preserving any R.S. 2477 right of way existing before October 21, 1976). In this way, the County is not acting pursuant to authority given to it by any state law but merely asserting a proprietary interest arising from federal law — a proprietary interest that a private individual might just as easily claim when posting road signs along his or her R.S. 2477 right of way (e.g., “two miles to the family ranch”).
None of this is to say that the County’s federal law claim under R.S. 2477 is necessarily a winning one. It isn’t at all clear whether (or to what degree) the holder of an R.S. 2477 right of way is entitled to regulate traffic on that right of way. Or whether (and to what degree) competing federal legislation protecting national lands may authorize BLM to restrict the ability of an R.S. 2477 holder to post numbering signs. Fact is, federal law doesn’t always point harmoniously in a single direction — and when it comes to land policy this is perhaps particularly true. Enacted in the nineteenth century, R.S. 2477 sought to promote development by allowing all comers to establish rights of way through federal property without any procedural formality, but by simply asserting and using them. In contrast, contemporary federal land use statutes and regulations like BLM’s give comparatively more attention to conservation. Trying to reconcile these two competing strands of federal law presents many sticky questions: Are BLM regulations purporting to regulate rights of way Congress granted in R.S. 2477 consistent with and reasonable interpretations of the FLPMA? If they are, to what extent do they allow BLM to limit the use of rights of way granted by R.S. 2477? Does an R.S. 2477 right of way holder have to prove its existing rights before exercising those rights in a federally regulated monument or park? Or may the holder use its right of way without pursuing any procedural formality? All of these are intriguing questions about which federal legal entitlement must give way, and to what extent.
But, critically for our purposes, no dispute involving only competing federal entitlements can ever present a redressable Supremacy Clause claim. And that’s the only claim presented in this lawsuit. Any possible relief we might give in a Supremacy Clause case — say, a declaration telling the County to stop enforcing a state law or policy, or an injunction voiding state law— won’t do the Society any good, won’t redress its asserted injuries. This is because no order we could issue under the *1179 Supremacy Clause could prevent the County from continuing to assert its federal rights. Cf. Warth v. Seldin, 422 U.S. 490, 506, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (voiding the challenged zoning ordinance would not redress plaintiffs’ claimed injury from lack of low-income housing); Linda R.S. v. Richard D., 410 U.S. 614, 618, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973) (no redressability, where plaintiff’s request that prosecutors file criminal charges against the father of her child would not result in child support). It may be that the Society has some other claim it might bring seeking to sort out the parties’ conflicting assertions of federal rights. But it simply doesn’t possess a redressable Supremacy Clause claim.[3]

Prudential Standing

I bother to go down this road only because of the nettles lining the prudential standing path. Prudential standing doctrine exists, of course, to prevent a party from asserting rights that really belong to a third party. See Warth, 422 U.S. at 499, 95 S.Ct. 2197. The majority says it’s clear from the nature of the Society’s lawsuit that it is seeking only to vindicate the property rights of the United States. The dissent takes issue with this characterization of the Society’s complaint. In the dissent’s view, the Society’s complaint doesn’t allege that BLM or any other federal entity has a superior property interest to the County. Rather, the Society alleges that BLM’s published management plan, *1180 regulatorily adopted pursuant to statutory authority under the FLPMA, deems certain roads closed to traffic, and the Society seeks to vindicate its members’ own interests in seeing that plan enforced as written. Simply put, in the dissent’s view, Society members don’t care who owns what rights, they only seek the enjoyment of the wilderness according to what (they say) the BLM’s regulations, as embodied in the published management plan, specify.
Respectfully, I don’t see any need to be drawn into this briar patch and tussle over the true and best meaning of the Society’s complaint. However its complaint is construed, the Society has no case left to pursue. Most of its suit is long dead, gone, moot. What very little is left isn’t redressable under the Supremacy Clause. That alone is enough to end this case. It may be that the Society has other means for obtaining relief, other claims to be brought in other suits. The questions whether and to what degree the County may permit OHVs and signs may be resolved in the ongoing quiet title action. Future and different ordinances may beget future and different lawsuits. But none of this means that we may take up the interesting questions associated with the Society’s and County’s and BLM’s competing federal law claims in any old lawsuit. We are courts of limited jurisdiction, with a written charter and prudential doctrines aimed at cabining our discretion, cautioning restraint in the face of temptation, and protecting us from improvident decisions. We may only address the questions put to us, and we may do so only when we have clear jurisdiction and legal authority. That much is lacking here. I respectfully concur.

. In some places, the dissent seems to suggest incorrectly that this lawsuit remains alive simply because the County harbors the desire to enact a different law at a different time after the quiet title action sorts out its R.S. 2477 rights. See Dissent at 1192-93. In other places, the dissent seems to acknowledge the correct legal standard under Cornfield, and to argue that the record proves the County intends to reenact its prior ordinance immediately. Id. But the portions of the record the dissent cites prove the opposite. For example, the dissent quotes a couple lines from a County commissioner’s deposition. See Dissent at 1192-93. When read in full, however, that deposition shows that the County and its commissioners do not intend to reenact the same ordinance but intend to wait "until [they] feel confident of the legal issues at play and until [they] consider a modified ordinance that would address several issues that [they] saw in the original ordinance.” Aplt.App. at 1212 (emphasis added); see also id. at 1216-17 (”[T]he wisest course of action was to resign our OHV ordinance, focus this on a property-rights issue and deal with the OHV and federal regulation case law issues down the road. And I’ll admit that I’m not ready to jump right back into that fray of OHV regulation. I think it’s going to require a lot of reflection on my part and consultation with attorneys before I recommend another OHV ordinance.”). Likewise, the dissent quotes only a part of a sentence of a County press release. See Dissent at 1192-93. But the relevant sentence, when read in full, says benignly that ”[l]itigating county transportation system roads as both a property right and an OHV management issue in federal court is too big a bite of the apple at the same time.” Aplt.App. at 839. Finally, the dissent says it's "especially” telling that Kane County retained its county road number signs "until the threat of contempt forced it” to remove them. See Dissent at 1192-93. But the undisputed facts *1177 show that the County voluntarily rescinded its OHV ordinance and removed all OHV-authorizing decals quickly after the Society filed suit; no judicial compulsion was involved. It is also beyond cavil that, under Utah law, without the ordinance and decals, OHV traffic is forbidden by law; unsurprisingly, mere road numbering signs don’t suffice to authorize OHV traffic on Utah public highways. Utah Code Ann. § 41-22-10.3. Of course, I freely admit (and discuss in a moment further) that the fact the County chose to keep its road numbering signs in place until a court ordered their removal means that the Society's separate challenge to those signs isn’t moot. But this only serves to highlight the particular and different posture of OHVs, the fact that the County does forbid and has long forbidden them, and that any dispute over them is moot.

. For purposes of this analysis, I follow the court's lead and assume without deciding that the Supremacy Clause affords a private right of action, and that such an action can be brought against state policies and practices as well as laws. Whether any of this is true is far from clear, of course. In Shaw v. Delta Air Lines, Inc. the Supreme Court noted that it had jurisdiction to hear a Supremacy Clause challenge but said nothing about the existence of an implied private right of action. 463 U.S. 85, 96 n. 14, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). To the contrary, the Court has repeatedly urged caution when it comes to the business of "finding” implied rights of action. See, e.g., Alexander v. Sandoval, 532 U.S. 275, 286-87, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress .... [Cjourts may not create one, no matter how desirable that might be as a poli *1178 cy matter----”). And there’s plenty of reason for caution here. For example, finding a private cause of action as a constitutional matter would permanently deprive Congress the power not to provide a right of action in its laws for private individuals to sue for Supremacy Clause violations. At the same time, doing so may be needless if the Declaratory Judgment Act or some other statute already provides a vehicle for bringing Supremacy Clause challenges, a possibility the parties in this case allude to but don't explore.

. In entering an injunction telling the County to remove its signs despite this claim of federal authority, the district court necessarily (if implicitly) first invalidated the County’s asserted federal R.S. 2477 right. In this way, the district court's injunction resolved an issue of conflicting claims under federal law adversely to the County. Essentially, the district court took up and decided a federal quiet title cause of action against the County with respect to the right to place numbering signs — and this of course it had no power to do in a case alleging only a Supremacy Clause cause of action. The dissent makes this same mistake even while contending that I’ve erred by "conflating standing and the merits.” Dissent at 1193. Tellingly, however, the dissent doesn't point to any merits question I decide against the Society. It doesn't because, of course, all I do is identify the fact that the parties’ competing — and unresolved — positions arise entirely under federal law and so can’t present a redressable Supremacy Clause claim. And this much we are constitutionally obliged to do. As courts of limited jurisdiction, federal courts are duty bound to examine facts and law in every lawsuit before them to ensure that they possess subject matter jurisdiction. Unsurprisingly, this duty includes the obligation to examine, as here, whether a favorable judgment on the plaintiff’s chosen cause of action would redress its claimed injuries. In Steel Co., for example, the plaintiff sought as relief certain pre-litigation costs, but the statute under which the plaintiff sued didn’t allow recovery of such costs. See 523 U.S. at 108-09, 118 S.Ct. 1003. Recognizing that even a favorable judgment on the plaintiff's chosen cause of action would fail to provide it with its requested relief (even if other causes of action might have succeeded), the Supreme Court dismissed the suit for lack of redressability. See id. Our case is in exactly the same posture. Perhaps recognizing this, the dissent falls back and tries to suggest that Kane County is actually asserting a state law interest arising from Utah Code §§ 41-22-10.1, -10.5, 72-3-103, -105 that a Supremacy Clause claim could remedy. See Dissent at 1194-95. As it happens, however, the Title 41 provisions the dissent cites have nothing to do with the County’s claimed authority to post road numbering signs on its claimed R.S. 2477 rights of way — they concern only the (moot) question of OHV regulation. Meanwhile, the Title 72 provisions the dissent cites allow the County to regulate other forms of traffic over R.S. 2477 rights of way only if and when the County possesses a valid federal R.S. 2477 claim to the right of way in question — thus confirming again the purely federal nature of the parties’ dispute. See § 72-5-301(7) (defining R.S. 2477 highways, which a county may regulate under subsequent provisions, as those constructed in accordance with federal law).